UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LARRY OLSON,<br><br>     Plaintiffs,<br><br>     vs.<br><br>TIM WENGLER, TOM KESSLER, and<br>BRIAN TITSWORTH,<br><br>     Defendants. | Case No. 1:12-cv-00077-REB<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court are Plaintiff's Motion to Compel Discovery (Dkt. 17), Plaintiff's Motion for Appointment of Counsel (Dkt. 18), and Defendants' Motion for Summary Judgment (Dkt. 20). All parties have consented to the jurisdiction of a United States Magistrate Judge to enter final orders in this case. (Dkt. 28.) *See* 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

Having reviewed the record, the Court finds that the decisional process would not be aided by oral argument. Accordingly, after due consideration, the Court enters the following Order granting Defendant's Motion for Summary Judgment and denying Plaintiff's Motion to Compel Discovery and Plaintiff's Motion for Appointment of Counsel.

# MOTION FOR SUMMARY JUDGMENT

## 1.     Standard of Law

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). The requirement is that there be no *genuine* dispute as to any *material* fact. Material facts are those "that might affect the outcome of the suit." *Id.* at 248. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.*

The moving party is entitled to summary judgment if that party shows that each material fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other

materials in the record." Fed. R. Civ. P. 56(c)(3).

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Liberty Lobby*, 477 U.S. at 252.

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2). The Court may grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

The Court does not determine the credibility of affiants or weigh the evidence of the non-moving party. Although all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin*

*v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The required elements of a retaliation claim are the following: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, . . . that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). Although a "chilling effect on First Amendment rights" is enough to state an injury, *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001), "bare allegations of arbitrary retaliation" are insufficient to be permitted to go forward on a retaliation claim, *Rizzo v. Dawson*, 778 F.2d 527, 532 n.4 (9th Cir. 1985).

Particularly at issue in this case is whether Plaintiff has brought forward sufficient evidence to show that the alleged retaliatory action did not advance legitimate penological goals, such as the preservation of institutional order, discipline, security, and rehabilitation of prisoners. *See Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curiam); *Rizzo*, 778 F.2d at 532. Federal courts "should 'afford appropriate deference and flexibility' to prison officials [when evaluating the] proffered legitimate penological reasons for conduct alleged to be retaliatory." *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (quoting *Sandin v. Conner*, 115 S.Ct. 2293, 2299 (1995)). "Specifically, the prison administrators cannot be held liable unless their retaliatory action did not advance legitimate goals of the correctional institution or was not tailored narrowly enough to achieve such goals." *Vance v. Barrett*, 345 F.3d 1083, 1093 (9th Cir. 2003).

While "timing can be properly considered as circumstantial evidence of retaliatory intent," there generally must be something more than timing alone to support an inference of retaliatory intent. *Pratt*, 65 F.3d at 808. Retaliation is not established simply by showing adverse activity by defendant *after* protected speech; plaintiff must show a nexus between the two. *See Huskey v. City of San Jose,* 204 F.3d 893, 899 (9th Cir. 2000) (a retaliation claim cannot rest on the logical fallacy of *post hoc, ergo propter hoc*, i.e., "after this, therefore because of this").

## 2.     Undisputed Material Facts

This section includes facts that are undisputed and material to the resolution of the issues in this case. Where material facts are in dispute, the Court has included Plaintiff's version of facts, insofar as that version is not contradicted by clear documentary evidence in the record.

At the time of the incidents alleged in the Complaint, Plaintiff was an inmate in the custody of the Idaho Department of Correction (IDOC), housed in the private prison operated by Corrections Corporation of America (CCA) under contract to the IDOC. He brings First Amendment retaliation claims against three CCA officials: Warden Tim Wengler, Assistant Warden Tom Kessler, and Correctional Officer Brian Titsworth. The allegations center on Plaintiff's placement and retention in segregation from October 6, 2011, to October 28, 2011.

On June 29, 2011, Plaintiff filed a grievance against Defendant Correctional Officer Brian Titsworth, asserting "abuse of discretionary powers & unprofessional

conduct." (Dkt. 25-4, p. 10.) Plaintiff complained that Titsworth forced inmates to use alternative electrical outlets and store all their property in their cubicles. Plaintiff complained: "When asked about this UM Titsworth rudely threatened by telling me and others "If you don't like it I'll move you to North Wing." (*Id*.) The grievance was denied by Bryan Johnson on June 30, 2011, stating that all property must be stored in a safe and orderly manner in assigned storage boxes or lockers in inmates' cells, and property cannot be maintained so as to create a fire hazard or sanitation, security, or housekeeping problems.

Plaintiff also alleges that he complained to Warden Wengler of a large number of conditions-of-confinement violations. (Dkt 25-4, p. 5.) Plaintiff further alleges that, at unspecified times, he provided investigators with important information about prison violence in *Kelly v. Wengler*, Case No. 1:11-cv-00185-EJL, that aided the inmates' case against prison officials. *Kelly* was a class action inmate lawsuit wherein the plaintiffs alleged that CCA prison officials did not do enough to protect inmates from violent attacks by other inmates. Plaintiff alleges that the *Kelly* case settled on September 20, 2011, and that Warden Wengler had duties under the settlement agreement to investigate and remedy future issues related to inmate safety when they were brought to his attention. (Dkt. 24-5.)

On September 29, 2011, while eating in the dining hall, Plaintiff heard someone say, "Give me your cookie." He thought it was a friend joking with him, but when he turned around, he realized it was an inmate who was a stranger to him. Another inmate

then said, "That's right, chomos, turn around before we beat your asses." (Dkt. 25-4, p. 2.) A third inmate accompanied the two threatening inmates. Plaintiff responded by telling the inmates that no one at the table was a "chomo," and they should get their facts straight. The three inmates "kept hurling threats." Plaintiff and his friends got up and walked away. (*Id.*) Plaintiff alleges that the "majority of the assaults . . . have occurred in the chow hall at ICC." (*Id.*) "Chomo" is a slang term in the prison for a person convicted of a sex offense against a minor child.

On September 30, 2011, Plaintiff sent a lengthy "letter of complaint" to Warden Wengler notifying him that he had been threatened with physical assault by several other inmates during dinner, who demanded his cookie and called him a "chomo." (Wengler Dec., Dkt. 20-4, Ex. A.)[1] Plaintiff alleges that his main concern, as outlined in his letter, was to notify Wengler that correctional officers were not performing their duties in the dining hall, i.e., were ignoring inmates who made references to "chomos," and that corrective measures should be taken. (Dkt. 25-4, p. 2.) Plaintiff denies that he felt threatened by the dining hall incident.

Also on September 30, 2011, Plaintiff sent Warden Wengler a concern form verifying that he sent the letter of complaint to Wengler. Plaintiff specifically mentioned that the letter of complaint had been sent pursuant to the settlement agreement in *Kelly v. Wengler*, Case No. 1:11-cv-00185-EJL. (Wengler Aff., Exhibit A, Dkt. 20-4, p. 2.)

_____

[1] Plaintiff clarifies that he was not incarcerated for that type of offense, but lived among inmates who were. (Dkt. 25-5, p. 1, Ex. M.)

**MEMORANDUM DECISION AND ORDER - 7**

Six calendar days or three and-a-half working days later (Dkt. 25-2, p. 4), on

October 6, 2011, Plaintiff was escorted to segregation by Officer Titsworth, who told

Plaintiff his placement in segregation for investigation resulted from Warden Wengler's

receipt of a concern that Plaintiff's life was in danger. Plaintiff could not have his

personal property in segregation, and he lost his institutional job. (Dkt. 25-4, p. 20.)

Wengler did not ask Plaintiff or his witness, inmate Don Rossignol, about what

happened in the dining hall. (Dkt. 25-2, p. 4.) Wengler declares: "In my experience,

inmates sometimes give vague notices of threats of violence because should their

correspondence be discovered by other inmates, they could be deemed by the prison

population a "snitch" or a "rat," and be placed in further threat of physical violence by

other inmates." (Dkt. 20-3, p.2.)

Plaintiff alleges that Assistant Warden Kessler said that "it was the Warden's idea

[meaning Warden Wengler]" that Plaintiff be placed in segregation. (Dkt. 25-4, p. 28, Ex.

K.) Kessler's Declaration states the same. (Kessler Dec., Dkt. 20-7, p. 5.) Case Manager

Sara Fink also noted in her investigative report that Warden Wengler made the decision to

place Plaintiff in segregation as a result of the letter about the dining hall threat. (Dkt. 20-

4, p. 1.)[2]

Wengler declares that he placed Plaintiff in SPI for Plaintiff's own safety, despite

---

[2] Plaintiff also alleges that Correctional Officer Brian Titsworth was responsible for the original placement of Plaintiff in segregation. However, the totality of the record shows that it was Wengler who placed Plaintiff in segregation. Therefore, this allegation about Titsworth cannot be included as an undisputed fact or considered a dispute over whether someone other than Wengler was the responsible defendant for the original segregation order.

the fact that Plaintiff had not requested protective custody, based on Wengler's experience and duty to protect inmates from violent assault. (Defendants' SOF, ¶¶ 13, 22.)

Plaintiff's official designation in segregation was "SPI," meaning segregation pending investigation, which had a 14-day time limit. (Kessler Dec., p. 5.) On October 12, 2011, Case Manager Sara Fink prepared an investigative report for Assistant Warden Kessler confirming that Plaintiff was placed in segregation after he wrote a letter to Warden Wengler about being harassed in the dining hall by "JKL inmates." (Dkt. 20-4, p. 1.) Fink wrote that JKL inmates said "give me your cookie" and called Plaintiff a "chomo," and that Plaintiff said he was not a "chomo" and walked away. The report does not state that inmates actually threatened Plaintiff multiple times, as he stated in his statement of facts. (Dkt. 25-4.) Ms. Fink concluded that she and Plaintiff thought Plaintiff could be housed safely in the west wing. (*Id.*)

Also on October 12, 2011, a restrictive housing hearing was held where the Restrictive Housing Placement Committee (Kessler, Tracy Koosman, and Justin Acosta) determined that they needed more information before they decided whether to place Plaintiff in protective custody or a new general population housing unit. (Acosta Dec., Dkt. 20-5, p. 3.) At the hearing, Kessler clarified for Plaintiff that he was not officially on "protective custody" status, but SPI status for his protection as a result of Wengler's judgment from the contents of the letter Plaintiff sent to Wengler, pending a decision of the committee. (Kessler Dec., Dkt. 20-7, p. 6.)

**MEMORANDUM DECISION AND ORDER - 9**

Plaintiff alleges that, at the October 12, 2011 Committee meeting, Kessler had authority to release Plaintiff from segregation after Fink, Acosta, and Koosman discussed their willingness to release Plaintiff into general population, but Kessler voted against release, allegedly only because Plaintiff had made the written complaints about CCA employees not performing their duties. Plaintiff alleges that Kessler denied having any knowledge of Plaintiff's complaints about staff not performing their duties, but at the same time asked him, "What's this about my employees failing to do their jobs?" Plaintiff alleges that these seemingly contradictory statements show that Kessler *did* have prior knowledge of Plaintiff's complaints. Plaintiff states that, at the meeting, he twice told Kessler to read the complaints first, and then Kessler and Plaintiff could talk. (Dkt. 25-1, pp. 304.)

Regardless of whether two of three Committee members and the Case Manager thought it was safe to release Plaintiff into the general population, the Committee's unanimous written determination on October 13, 2011, was to defer release in favor of gathering more information before making a decision. (Dkt. 20-6, p. 1.) No Committee member entered a written dissenting opinion from the decision. (*Id.*) Plaintiff's next hearing was set for October 19, 2011, the date of the next routine Committee meeting. (*Id.*; Kessler, Dec., Dkt. 20-7, p. 7.)

On October 19, 2011, an order was entered that extended Plaintiff's status in SPI for another 7 days. A duplicate order was entered on October 21, 2011. (Kessler. Dec.,

Dkt. 20-7, p. 7 & Exhibit D, pp. 1-2.)

On October 26, 2011, the Committee held its final hearing and determined that
Plaintiff should be moved to a general population housing unit in G, H, or I Pod. (Acosta
Dec., Dkt. 20-5, p. 5.) Kessler declares that he recommended this housing change because
"between the time period of October 12, 2011, and October 26, 2011, there was no
information that arose which would indicate that Inmate Olson was at any further risk of
assault at that time." (Kessler Dec., Dkt. 20-7, p. 8.) Kooser did not sit in on the
Committee hearing; rather, "ACOS" Melody did. (Kooser Dec., Dkt. 20-13, p. 4; Dkt. 20-
6, p. 2, Ex. B.)

On October 28, 2011, Plaintiff was released from segregation into H Pod. Justin
Acosta, one of the Committee members, declares: "This delay was not intentional but
rather a logistical issue of placing Inmate Olson in an available cell where the Committee
had recommended him to be housed." (Acosta Dec., Dkt. 20-5, p. 5.) Acosta notes that it
has been his experience that transferring inmates out of segregation often takes several
additional days while prison officials find an empty bed, because other prison officials are
also simultaneously transferring inmates into the facility, and anticipated beds may not be
open. (*Id.*)

Plaintiff alleges that, because he had complained of Correctional Officer
Titsworth's actions in the June 2011 grievance, Titsworth tried to interfere with Plaintiff's
release from segregation by denying or delaying placement into another unit between

October 26, 2011, and October 28, 2011. (Complaint, Dkt. 3.) Plaintiff and other inmates declare under oath that, in June 2011, when inmates complained that Titsworth made them place their property in their cubicles and move their electrical cords to different outlets, Titsworth said that he didn't care about inmates' constitutional rights, and that Titsworth threatened to move Plaintiff and other inmates to a more violent part of the prison if they didn't like Titsworth's rules or if they continued to complain. (*Id.*, pp. 7-8.)

### 3.    Discussion

Plaintiff asserts that Warden Wengler placed Plaintiff in protective custody in retaliation for Plaintiff complaining that staff was failing to do their duties to supervise inmates in the dining hall and for complaining of conditions of confinement. Plaintiff points to timing of his complaint, a six- or three-day delay in placing him in segregation, Plaintiff's own interpretation of the inmates' threats, and Plaintiff's opinions about how Warden Wengler should have responded when he received Plaintiff's letter of complaint. In all of these allegations, Plaintiff fails to show that Wengler acted without the legitimate penological reasons of protecting Plaintiff and safeguarding institutional security.

Beginning with Plaintiff's own acts in informing Warden Wengler of the inmate threat against him and reminding Wengler of obligations Plaintiff says were contained in the *Kelly* settlement agreement terms, Wengler took the cautionary steps of placing Plaintiff in SPI so that Plaintiff could be protected from the JKL inmates while the potential threat was investigated. Therefore, while Warden Wengler's actions were

motivated by Plaintiff's complaints, it was the actual threat against Plaintiff articulated in Plaintiff's own letter and not the act of complaining or the content about staff not doing their jobs that was the operative element causing (and, it can be argued, requiring) Warden Wengler to act. A legitimate penological reason existed for the SPI placement, and, therefore, any other motives, even if retaliatory, are inconsequential to the cause of action.

Plaintiff has a mistaken estimation of the duty of the warden and assistant warden of a prison to keep the inmates safe in the face of an actual threat, just as Plaintiff naively believes that, if Plaintiff's *intent* was not to report he *felt* threatened but to report that correctional officers were not doing their jobs, then the warden should simply believe that Plaintiff would be safe from future harm. Plaintiff states that, had the warden spoken to him for a few minutes, the issue would have been cleared up immediately. Plaintiff fails to see that he himself did not possess the information whether the JKL inmates planned to harm him. Plaintiff is merely speculating that, because he explained to the JKL inmates that Plaintiff was not actually a "chomo," they would reasonably stop demanding his desserts in the lunch room and not follow through on their threats to "beat" him, even though Plaintiff himself reports that, when he actually told the inmates he was not a "chomo," they *continued* to "hurl threats." Unfortunately, the reason many individuals are in prison is because they have acted unreasonably, and so Plaintiff's view of whether or not the JKL inmates would act reasonably in response to Plaintiff's announcement that he

was not a "chomo" is too simplistic. Further, as Warden Wengler recognized, at the point Plaintiff complained the JKL inmates could have targeted Plaintiff for being a snitch, and harassed or harmed him for that reason, instead.

Plaintiff's one-sided arguments fail to support his claim that there was no penological interest in placing and keeping him in SPI for about a month. Ms. Fink's report says, Plaintiff "was not threatened" during the dining hall incident (Dkt. 25-4, p. 4), while Plaintiff's other versions of the incident state that the inmates actually said to him, "turn around before we beat your asses" and the inmates also "kept hurling threats" as Plaintiff walked away, which amounts to at least two different threats during the incident. (Dkt. 25-4, p. 2.) Further investigation after Ms. Fink's cursory investigative report seems a prudent course of action for Assistant Warden Kessler to take.

In addition, Plaintiff alleges that Defendant Kessler kept him in SPI after the hearing of October 13, 2011, in retaliation for Plaintiff having filed complaints against staff, but Plaintiff also alleges that, during the hearing, Plaintiff insisted that Kessler first read Plaintiff's "complaints" and only then would Plaintiff talk with him – which can be construed as an invitation to do *more* investigation, which is what the Committee eventually concluded that day. Even without Plaintiff's own invitation to read his complaints before Plaintiff would speak any further with Kessler, as an assistant warden with nearly coextensive ultimate responsibility with Warden Wengler for keeping Plaintiff safe, Kessler certainly was within his authority to delay a final decision to take

into consideration all factors, even if the other lower-level Committee members believed release was safe. It is to be noted that, despite any discussion about release at the October 13 hearing, no Committee member dissented in writing from the decision to defer the new housing placement assignment decision.

Further, Defendants' denials that they made various statements attributed to them by Plaintiffs and other inmates does not create a genuine dispute of material fact in the face of an undisputed actual threat to Plaintiff, communicated directly from Plaintiff to Warden Wengler. Even if Defendant Kessler argued with Plaintiff or the other Committee members in what Plaintiff describes as a "hostile" manner, even if the Committee members disagreed about Plaintiff's placement, and even if Officer Titsworth made unprofessional threats to Plaintiff about not caring about his constitutional rights and moving him to a more dangerous housing assignment if he continued to complain,[3] a legitimate penological reason existed for Plaintiff's placement and continuation in SPI until the Committee decided he could be placed safely in the general population.

Further, while Plaintiff alleges that an unidentified CCA staff person told him that Titsworth interfered with his release from PSI for two days, Plaintiff has chosen not to identify that staff member and has not brought forward any affidavits from staff to that effect, nor has he shown that it was even possible for Titsworth to interfere with his

---

[3] The fact of the matter is that Plaintiff was moved to a *safer* environment upon his reporting of a threat from other inmates.

release, since the declarations on record reflect that Titsworth had nothing to do with housing assignments and that short delays were not unusual during reassignments due to different officials simultaneously selecting the same beds for different inmates.

In summary, the record is clear. Plaintiff complained to Warden Wengler about an actual threat of physical harm from other inmates. Plaintiff notified Warden Wengler that he perceived the incident was related to Wengler's investigative and remedial duties under the *Kelly* settlement agreement terms. Warden Wengler placed Plaintiff in PSI to keep him safe pending an investigation. Ms. Fink undertook an investigation. A three-member committee several times considered Plaintiff's safety and housing assignment. Plaintiff was released from segregation within two days after it was determined that he could be safely returned to the population. Plaintiff cannot prove his claims upon that record.

**4.      Conclusion**

Plaintiff has failed to show that he has sufficient facts upon which to proceed to a jury trial on the element of an absence of legitimate penological reason to transfer him into SPI, with the strongest evidence being Plaintiff's own correspondence. Accordingly, the Court grants Defendants' Motion for Summary Judgment, and Plaintiff's Complaint is dismissed with prejudice.

The Court will now discuss Plaintiff's other motions, which the Court considered before deciding the Motion for Summary Judgment, but which are more clearly explained

after the parties have read the discussion articulated above.

## PLAINTIFF'S MOTION TO COMPEL

Plaintiff requested documents from Defendants on September 14, 2012, November 29, 2012, and January 10, 2013. (Dkt. 17 & 17-1, Ex. 1, 2.) Defendants have produced various documentation to Plaintiff and also objected to the production of other documents on grounds that the request is vague, overbroad, and irrelevant. Plaintiff now moves to compel Defendants to produce additional documents. (Dkt. 17.)

Federal Rule of Civil Procedure 26(b) allows parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense," but discovery requests must be reasonable. The term "relevant" includes information that is "reasonably calculated to lead to the discovery of admissible evidence and that "need not be admissible at the trial." Fed. R. Civ. P. 26(b)(1). However, district courts have broad discretion to apply the discovery rules in a way that will achieve the policy of the Federal Rules of Civil Procedure, which is to "secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

If the answering party fails to adequately respond to discovery, the propounding party can move for an order compelling discovery under Federal Rule of Civil Procedure 37(a). A court should deny a motion to compel if the information requested falls outside the scope of discovery. *See Nugget Hydroelectric, L.P. v. Pacific Gas & Elec. Co.*, 981 F.2d 429, 438-39 (9th Cir.1992), *cert. denied*, 113 S.Ct. 2336 (1993). In addition, a court

"may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(d)(1).

Having reviewed Plaintiff's requests for discovery, Defendants' responses to the discovery request, and all of the documents produced to the Court to date, the Court concludes that Defendants have sufficiently responded to the discovery requests of Plaintiff, and that Defendants' objections to searching for and producing other documents should be sustained under the narrow circumstances of this case. Defendants have produced to Plaintiff relevant information and documents. The record overwhelmingly reflects that Plaintiff was placed in protective custody segregation by Warden Wengler after Plaintiff directly informed him of threats of violence against Plaintiff, and in the midst of or directly on the heels of a class action lawsuit alleging that CCA officials failed to protect its inmates from inmate-on-inmate violence. Other evidence Plaintiff seeks, especially concerning Correctional Officer Titsworth, would not help him overcome the missing element of his claim – to show that the action, even if retaliatory, did not advance a legitimate penological goal or was not narrowly tailored to meet the goal of protecting Plaintiff. Accordingly, the Motion to Compel is denied.

## PLAINTIFF'S MOTION FOR APPOINTMENT OF COUNSEL

The Court previously denied Plaintiff's request for appointment of counsel. (Dkt. 7.) Plaintiff seeks reconsideration of his request for appointment of counsel because he is having difficulties conducting discovery. (Dkt. 18.) He is proceeding in forma pauperis.

(Dkt. 7.) Unlike criminal defendants, prisoners and indigents in civil actions have no constitutional right to counsel unless their physical liberty is at stake. *Lassiter v. Dept. of Social Services*, 452 U.S. 18, 25 (1981). Whether a court appoints counsel for indigent litigants is within the court's discretion. *Wilborn v. Escalderon*, 789 F.2d 1328, 1330-31 (9th Cir. 1986); *Terrell v. Brewer*, 935 F.2d 1015, 1017 (9th Cir. 1991).

In *Bounds v. Smith*, 430 U.S. 817, 828 (1977), the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." In *Lewis v. Casey*, 518 U.S. 343 (1996), the Court explained the limitations of the *Bounds* holding. There, the Court emphasized that "*Bounds* did not create an abstract, freestanding right to a law library or legal assistance." 518 U.S. at 351. A careful review of the *Casey* decision demonstrates that the Supreme Court has limited the application of *Bounds* to *initial filings* of prisoner cases involving their convictions or conditions of confinement. Particularly, the Court stated:

> It must be acknowledged that several statements in *Bounds* went beyond the right of access recognized in the earlier cases on which it relied, which was a *right to bring* to court a grievance that the inmate wishes to present. These statements appear to suggest that the State must enable the prisoner to discover grievances, and *to litigate effectively once in court*. These elaborations upon the right of access to the court have no antecedent in our pre-*Bounds* cases, and *we now disclaim them*."

518 U.S. at 354 (emphasis added).

Here, Plaintiff's inability to more fully litigate his claims are "incidental (and perfectly constitutional) consequences of conviction and incarceration." *Lewis v. Casey*, 518 U.S. at 355. It is difficult to litigate from a prison cell and pro se individuals do not have the legal training or resources to do what they could if they were lawyers or had lawyers. However, prisoner status and lack of legal expertise are not enough to warrant appointment of counsel.

In the District of Idaho, the Court regularly provides for disclosure in prisoner pro se cases, which is not mandatory under the Rules of Civil Procedure. *See* Fed. R. Civ. P. 26(a)(1)(B)(iv). The Court requires disclosure from defendants so that pro se plaintiffs do not have to otherwise seek discovery on information and documents relevant to their case, except for those areas where a plaintiff believes a wider scope of discovery is necessary due to the particular facts alleged.

In this case, Plaintiff has shown that his litigation skills exceed that of most prisoners, despite the limitations he cites. In its review of the Motion for Summary Judgment, the Court finds that additional discovery and aid from counsel would not help Plaintiff meet the missing element of his claims, given the record before the Court, which overwhelmingly shows that Plaintiff's claim lacks merit. Accordingly, the Motion for Appointment of Counsel is denied.

# ORDER

**IT IS ORDERED:**

1.    Defendants' Motion for Summary Judgment (Dkt. 20) is GRANTED.

2.    Plaintiff's Motion to Compel Discovery (Dkt. 17) is DENIED.

3.    Plaintiff's Motion for Appointment of Counsel and to Reconsider (Dkt. 18)

      is DENIED.

4.    Plaintiff's Complaint is DISMISSED with prejudice.

DATED:  **January 27, 2014**

_____
Honorable Ronald E. Bush
U. S. Magistrate Judge